Filed 1/27/25  P. v. Young CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B331830 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA384433) |
| v. | |
| DESTINY YOUNG, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee and Michael C. Keller, Deputy Attorneys General for Plaintiff and Respondent.

In 2014, Destiny Young pleaded guilty to two counts of voluntary manslaughter (Pen. Code,[1] § 192, subd. (a)), three counts of robbery (§ 211), and three counts of attempted robbery (§§ 664/211), which she committed with her boyfriend Jabaar Thomas.[2] Pursuant to a plea agreement, Young was sentenced to an aggregate determinate term of 25 years in prison in exchange for her truthful testimony at Thomas's trial.

In 2022, Young filed a petition for vacatur of her two voluntary manslaughter convictions and resentencing pursuant to section 1172.6.[3] Following an evidentiary hearing, the trial court denied the petition because the court found the prosecution had proved beyond a reasonable doubt that Young was guilty of the murders of Marcelo Aragon and Gabriel Ben-Meir under sections 188 and 189 as amended. On appeal, Young contends that the evidence was insufficient to support the trial court's findings.

---

[1] All further statutory references are to the Penal Code.

[2] Because our resolution of this case does not require that we discuss the other robberies and attempted robberies Young committed with Thomas over the month that they dated, we do not include them in the opinion.

[3] This was Young's second petition for resentencing. The trial court denied her first petition because former section 1170.95 (now § 1172.6) did not apply to manslaughter convictions. This court affirmed the trial court's order. Former section 1170.95 was subsequently amended to include relief for defendants with manslaughter convictions where the defendant accepted a plea offer in lieu of a trial in which the defendant could have been convicted of murder.

We affirm the trial court's order.

## FACTS AND PROCEDURAL HISTORY[4]

A. *Facts*

In mid-April of 2011, Young moved into her godmother's house. She met Thomas at a nearby liquor store on or about April 15, 2011. Young initially thought Thomas was approaching her to sell her drugs. The two ran into each other again in the neighborhood after that and quickly became friendly.

Young's godmother told her not the get involved with Thomas. Young's godmother was wary of Thomas because she had a previous confrontation with him. Young's godmother also knew Thomas to be violent. She said Thomas "was a woman beater and a bad person." Thomas had beaten a woman who

---

[4] The facts are taken from Young's May 2011 police interrogation, her April 2012 preliminary hearing, her June 2013 proffer interview, and her February 2016 testimony at Thomas's trial. Although the trial court did not specify which documents were admitted into evidence at the evidentiary hearing, the parties agree that these were the sources the court considered in making its ruling. From our review of the transcripts of the hearing, that appears to be correct. In light of the parties' agreement, our own review of the transcript of the evidentiary hearing, and the absence of contentions relating to the admission of evidence, we accept the parties' representations. We note that although Young attached these documents to her evidentiary brief filed with the trial court (see post), they were not included in the record on appeal. Young moved to augment the record, and we granted her motion in our order of June 21, 2024.

Young's godmother knew.  The woman was injured so badly that she had to be "put in the hospital."

Young disregarded her godmother's advice and continued to see Thomas.  The first week they met they saw each other every day.  She and Thomas were in a romantic relationship from mid-April to May 11, 2011, when they were arrested.  Young's godmother did not allow Thomas inside her house, so they drove around together a lot while Thomas sold crack.  Young was never afraid of Thomas, but she had "seen him get a pretty good temper[,]" and she knew he was "hot-headed."  Young admitted that, during the second week she was dating Thomas (prior to his commission of the murders in the instant case), she saw him "put hands on" the neighbor across the street.

Thomas told Young that he had committed robberies before.  He was very "[n]onchalant" when he said it, "like it didn't matter."  Young was committed to the relationship.  She was willing to aid Thomas in the robberies regardless of what happened.  Young let Thomas keep a sawed-off shotgun in the trunk of her car.

### 1.　　The Aragon Murder

In the early morning hours on April 30, 2011, Thomas and Young were driving around in his rental car looking for someone to rob.  Young drove and Thomas sat next to her in the front passenger seat with the shotgun concealed inside a bag.  Young was "hoping that [Thomas] wouldn't hurt nobody", but she thought it was possible that Thomas would hurt someone using the shotgun.

4

Young and Thomas spotted three males walking together. Young drove past the men. One man, later identified as Marcelo Aragon, split off from his friends. Thomas told Young to circle back past Aragon so that Thomas could determine if Aragon was alone and rob him. Young circled back. Thomas waited a minute while Aragon's companions continued walking down the road, and then got out of the car with the shotgun. Young did not try to dissuade Thomas. She remained inside the car in the middle of the street with the engine running and the lights on.

Young kept a lookout, but intermittently looked back over her shoulder to watch the robbery. She saw the two men struggling. It appeared to her that Aragon was attempting to get Thomas's hands off of him. Thomas was still holding the shotgun. Young turned away to make sure there were no people or cars in the area. She heard a gunshot followed by a scream that she described as "close to blood[]curdling", but "louder than that." When she looked back again, Thomas was "skipping" toward the car with the gun. Thomas got inside and Young began driving away. As she did, Young looked back and saw Aragon leaning against a wall.

Young did not ask Thomas whether he shot Aragon and Thomas did not say. "[T]he way that [Aragon] screamed, [she knew] something had to happen but [she] didn't want to know for sure." Young just "didn't want to process it." "It was more convenient for [her] to not to get confirmation . . . ." She "turn[ed] a blind eye" to the shooting rather than trying to help Aragon or confirm that he had been shot because she wanted to ignore "the bad" and continue dating Thomas.

Thomas did not tell Young to drive him away from the shooting. She drove away "[b]ecause [she] needed to." She

wanted to "get away from the scene." Young went to her godmother's house and got out. Thomas drove off in the rental car. Thomas stole about $30 from Aragon. Later, Young and Thomas bought alcohol using the money. Aragon died of the gunshot wound.

### 2. The Ben-Meir Murder

On May 8, 2011, at around 12:00 or 1:00 a.m., Young and Thomas drove around looking for someone to rob using Young's car. Young drove Thomas to a friend's house to pick up Thomas's shotgun. Thomas then rode in the front passenger seat of Young's car with the shotgun. They spotted a man later identified as Gabriel Ben-Meir exiting his car carrying groceries. Ben-Meir started to cross the street. Thomas told Young to stop, so she drove up a little bit and stopped in the street. Young was concerned when Thomas got out of the car, but she did not drive away because she knew Thomas would get caught without her. Young looked back and saw Thomas and Ben-Meir engaged in a struggle. Ben-Meir was down on his knees. She looked away briefly, and when she looked back again Ben-Meir was face-down on the ground with his hands up. Young heard a gunshot. Ben-Meir was lying flat on the ground. Young did not recall seeing Ben-Meir move after the gun shot. Thomas returned to Young's car with Ben-Meir's groceries and the shotgun. Young asked Thomas if he shot Ben-Meir, and Thomas denied it. Young drove them away from the scene. Young said that hearing the gunshot

did not bother her because she did not know what actually happened.  She did not see Thomas shoot Ben-Meir.[5]

## B.    *Petition for Resentencing*

In May 2022, Young filed a petition for resentencing utilizing a standard form.  The court appointed counsel.[6]

The court ordered copies of the record in Young's first section 1170.95 petition for resentencing, the "plea transcript," and Young's testimony at former codefendant Thomas's trial.

Following a hearing on the matter, the court found Young prima facie eligible for relief under section 1172.6 and issued an order to show cause.

---

[5] Young's version of the facts changed over time.  When she was initially arrested she said Thomas borrowed her car a few times, and intimated that he may have used her car in a robbery without her knowledge.  Young told police she knew Thomas had taken money from random people on the street.  Thomas told her about the street robberies, but he did not say anything specific.  He would just come back with money and say, " 'I got somebody.' "  Thomas never said that he had used a shotgun.  Young told the police she thought it would be stupid of him to walk down the street with it.  Young denied that she had ever been with Thomas while he was committing a robbery.  Young was more forthcoming at the proffer and in her testimony at Thomas's trial, and the majority of the facts were gleaned after her preliminary hearing testimony.

[6] The court directed the People to respond and/or appear at the next scheduled hearing.  The People did not file a response, but appeared at all proceedings.

In June 2022, Young filed an evidentiary brief, contending that she could not be found guilty of the murders under sections 188 and 189 as amended because she was not a major participant in the underlying robberies who acted with reckless indifference to human life. Young also contended that the People had violated her right to due process by making arguments that were inconsistent with the position the People took at Thomas's trial.

Attached to the brief were transcripts of Young's May 2011 interview with police; transcripts of Young's April 2012 preliminary hearing testimony; transcripts of Young's June 2013 proffer; a copy of Young's March 2014 cooperation agreement with the District Attorney; transcripts of Young's testimony at Thomas's trial in February 2016; the prosecution's arguments at Thomas's trial; and Dr. Nancy Kaser-Boyd's 2023 psychological evaluation of Young based on an evaluation she conducted in 2013.

## C.    *Section 1172.6 Evidentiary Hearing*

At the evidentiary hearing, the People argued that Young was a major participant in the robbery of Aragon who acted with reckless indifference to human life, and that she could still be convicted of murder under the current laws.

Defense counsel argued that the prosecutor had taken a very different view at Thomas's trial, and depicted Young as minimally involved and pathetic in her desire to be loved. Young was characterized as an unsophisticated driver who took direction from Thomas. Counsel emphasized that Young had not seen Thomas kill either of the victims and did not know anyone had died until her interview with police. It may have been willful

8

ignorance on her part, but not reckless indifference.  Young had only known Thomas for two weeks before he killed Aragon, and she had not witnessed Thomas being violent.  Although her godmother told her Thomas was a " 'woman-beater,' " Young had never personally seen that side of him.  Young was suffering from mental disorders that caused her to deny that reality.[7]  She was drinking hard liquor daily.  Young's mental disorders prevented her from being a restraining influence.  She never left the vehicle and never told Thomas to shoot anyone.  Young's participation in a garden variety armed robbery where death was possible was insufficient to establish reckless indifference.

## D.    *Trial Court's Ruling*

The trial court found Young not credible.  The court stated that Young continually minimized her role and had a "selective memory."  What Young remembered and what happened changed depending on her "status."  The court specifically rejected Young's story that she did not know the victims had been shot and/or killed.

As to both victims, the trial court found that Young was guilty under the current laws of felony murder as a major participant in the underlying robberies who acted with reckless

---

[7] At the hearing, the defense called Dr. Kaser-Boyd to testify regarding Young's mental disorders.  The prosecutor objected on relevance grounds.  The trial court permitted the testimony insofar as it related to the issue of reckless indifference to human life.  We do not include a recitation of Dr. Kaser-Boyd's testimony here, as neither party mentions it on appeal and it does not appear to have factored into the trial court's decision.

indifference to human life.  With respect to the murder of Ben-Meir, the trial court additionally found that Young was guilty of malice murder because she acted with intent to kill, or alternatively, because she acted with implied malice.[8]

## DISCUSSION

### A.    *Section 1172.6*

Effective January 1, 2019, the Legislature amended sections 188 and 189 "as to the 'felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  (Sen. Bill No. 1437 (2017–2018 Reg. Sess.); Stats. 2018, ch. 1015, § 1, subd. (f).)  As amended, the law defining malice provides that except for first degree felony murder, 'in order to be convicted of murder, a principal in a crime shall act with malice aforethought. . . .' [Citations.]"  (*People v. Basler* (2022) 80 Cal.App.5th 46, 54, fn. omitted.)

Pursuant to section 1172.6, subdivision (a), a person convicted of manslaughter by plea may file a petition to have the manslaughter conviction vacated and to be resentenced if "(1) A complaint, information, or indictment was filed against the

---

[8] Because we conclude that Young was a major participant who acted with reckless indifference to human life in both robberies, we need not address whether she acted with implied malice or intent to kill in Ben Meir's murder.

petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, . . . .  [¶] (2) The petitioner was convicted of . . . manslaughter [after] accept[ing] a plea offer in lieu of a trial at which the petitioner could have been convicted of murder . . . . [and] [¶] (3) The petitioner could not presently be convicted of murder . . . because of changes to [s]ection 188 or 189 made effective January 1, 2019."

If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the trial court must issue an order to show cause.  If an order to show cause issues, the court then "hold[s] a hearing to determine whether to vacate the . . . manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts," unless the parties "waive a resentencing hearing and stipulate that the petitioner is eligible to have [his or her] . . . conviction vacated and to be resentenced."  (§ 1172.6, subd. (d)(1)–(2).)  "At the hearing . . . the burden of proof . . . [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder . . . ."  (§ 1172.6, subd. (d)(3).)

On appeal from a trial court's order denying a section 1172.6 petition following a subdivision (d)(3) hearing, this court evaluates the sufficiency of the evidence supporting the court's determination using the substantial evidence standard of review.  (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747.)  " '[W]e look to whether the prosecution has introduced sufficient evidence of " ' "reasonable, credible, and of solid value" ' " to "support a finding beyond a reasonable doubt" ' that petitioner was guilty.

11

([*People v.*] *Clark* [(2016)] 63 Cal.4th [522,] 618 [(*Clark*)].)" (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1017 (*Henley*).) Questions of law are reviewed de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)

## B.  *Felony Murder*

"Under the amended felony-murder rule, a defendant who was not the actual killer and did not act with the intent to kill can only be liable for murder if [the defendant] was a major participant in the underlying felony and acted with reckless indifference to human life.  [Citations.]  '[T]he standard under section 189, subdivision (e)(3) for holding . . . a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter.'  [Citation.] Accordingly, death penalty cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *Clark*, *supra*, 63 Cal.4th 522, are controlling . . . ." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123.)

### 1.  Major Participant

In determining whether the defendant was a major participant in the underlying felony, "the ultimate question [is] whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'  [Citations.]" (*Banks*, *supra*, 61 Cal.4th at p. 803.)  To do so, we consider multiple factors, including:  "What role did the defendant have in planning the

criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Ibid.*, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Ibid.*)

With respect to the first *Banks* factor—Young's role in planning the offenses—there is no evidence that Young was involved in planning the robbery of Aragon.  Contrary to Young's assertions, however, her role went "beyond that of 'an ordinary aider and abettor to an ordinary felony murder.' "  Young drove Thomas around the neighborhood searching for a target, and acted as a lookout and getaway driver.  Her participation as the driver was critical to both locating and stealthily approaching a victim.  The sawed-off shotgun was difficult to conceal due to its size.  Young recognized this and told officers it would be stupid of Thomas to walk down the street with it.  Without her assistance, Thomas would have a difficult time catching victims off guard because of the shotgun.  The shotgun would also be difficult to conceal following a robbery.  Young acknowledged this as well— she stated that she did not drive away because she knew if she did Thomas would get caught.  Young's role in Aragon's robbery was significant and weighs against her.  This is even truer of the robbery of Ben-Meir.  In that robbery, Young was necessarily

13

involved in the planning—she drove Thomas in her own vehicle rather than a rental car.

As to the second *Banks* factor, there was no evidence that Young provided Thomas with the shotgun in either instance, but she knew that he had the shotgun and stored it in her car for him. She also admitted that she knew the shotgun was loaded. In the Ben-Meir robbery, Young drove Thomas to a friend's house to get the shotgun. This factor also weighs against her as to both murders.

Regarding the third *Banks* factor, Young was fully aware that Thomas had a history of violence. Her godmother warned her to stay away from him when they first met and banned him from coming into her house because he had beaten a woman so badly that she had to be "put in the hospital." Young herself saw Thomas "put hands on" a neighbor. Young went into both robberies knowing that Thomas had this history of violence. The trial court found that when Young and Thomas robbed Ben-Meir, Young was additionally aware that Thomas had shot Aragon (likely fatally) in the earlier robbery. The third factor weighs against Young in both murders.

As to the fourth factor—was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?—Young was only a short distance away and watched both robberies transpire. She knew that there was a physical struggle in both robberies, but did nothing to prevent further violence. With respect to Aragon, Young observed that Thomas was holding the shotgun and Aragon was attempting to free himself. Instead of attempting to deescalate the conflict by getting Thomas to leave, or alternatively leaving

14

in the running car to seek help, Young stood guard, scanning the area to ensure that no one else was witnessing the robbery, and waiting to assist Thomas in his escape. In the case of Ben-Meir she saw Thomas standing over his victim—Ben-Meir was first on his knees and then face-down on the ground with his hands up. The trial court found that Young knew Thomas had previously shot Aragon, based on her statements that she had heard the shotgun fire, she heard a louder than blood-curdling scream, and she saw Aragon slumped against a wall. Despite this, Young did nothing to try to dissuade Thomas when she saw him standing over a helpless Ben-Meir with the shotgun. She consistently stated and testified that she was not afraid of Thomas and that she was not forced into doing anything—she was in the relationship no matter the consequences. In short, Young could have attempted to intervene in both robberies, or alternatively seek help when things started to become dangerously violent, but she chose not to.

Regarding the fifth *Banks* factor—Young's actions after the force was used—Young knew that the robbery victims had been shot, but she did nothing to assist them. Instead, she drove Thomas away from the scene because it was "more convenient" for her to avoid acknowledging that Thomas shot and likely killed both men.

Substantial evidence supports the trial court's finding that Young was a major participant in the robberies.

## 2. Reckless Indifference

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element,

15

'[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) To determine whether defendant had the requisite mental state, "[w]e analyze the totality of the circumstances" in a manner that largely overlaps with our major participant discussion. (*Id.* at pp. 676–677.) As our Supreme Court has explained, " '[a]lthough we state these two requirements separately, they often overlap,' " " 'for the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.)

"In *Clark*, *supra*, 63 Cal.4th at pages 618 through 622, the California Supreme Court established a five-factor test for whether a defendant acted with reckless indifference to human life. . . . [N]o one factor is necessary, nor is any necessarily sufficient. The first factor is the defendant's knowledge of weapons, and use and number of weapons. (*Id.* at p. 618.) 'The mere fact of a defendant's awareness that a gun will be used in

the felony is not sufficient to establish reckless indifference to human life.' (*Ibid*.) However, it may be 'significant' if a defendant personally uses a weapon during the crime. (*Ibid*.) The second factor is whether the defendant was physically present at the crime scene and whether he or she had opportunities to limit the crime or aid the victim(s). (*Id*. at p. 619.) A defendant's presence may be particularly significant where 'the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force.' (*Ibid*.) The third factor is the duration of the felony; crimes of longer duration present greater risk of violence and therefore evince more reckless indifference. (*Id*. at p. 620.) 'Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" [citation], possibly culminating in murder.' (*Ibid*.) The fourth factor is the defendant's knowledge of his or her coparticipants' likelihood of killing. (*Id*. at p. 621.) A defendant who knows a coparticipant previously has used lethal force is more culpable than one unaware of a coparticipant's propensity for violence. (*Ibid*.) The fifth factor is whether the defendant made any efforts to minimize the risk of violence. (*Ibid*.) Such efforts may include planning the crime to occur at a time or location where bystanders are unlikely to be present, or using unloaded or minimally loaded firearms. (See *id*. at pp. 621–622.)" (*Henley, supra,* 85 Cal.App.5th at pp. 1015–1016.)

We have already found that Young was a major participant in the robberies. This alone is a factor that weighs heavily against her.

With respect to the first factor—knowledge of weapons—as we discussed, Young knew that Thomas planned to use a shotgun. She did not purchase the shotgun or personally give it to him, but she facilitated Thomas's procurement and use of it by storing the weapon in her car for him prior to both robberies and driving Thomas to a friend's house to retrieve the shotgun for use in the Ben-Meir robbery. When Thomas robbed Ben-Meir, Young knew the gun was loaded and that Thomas had fired it when he robbed Aragon. Although Young did not personally use the shotgun, her storage and aid in retrieving the weapon weigh against her. The shotgun was bulky and hard to conceal. Had she not assisted Thomas, he may not have been able to use the shotgun in the robberies. When considered in the context of the wide spectrum of knowledge and involvement with deadly weapons, Young's actions place her closer to the defendant who supplies the weapons, loads them, or wields them himself than to the defendant who has no knowledge of the weapons involved. In the Ben-Meir murder her actions were particularly egregious because she was acutely aware that Thomas was willing to shoot and possibly kill the victim.

Regarding the second factor, Young was present on the scene. Our Supreme Court has counseled that " '[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows [her] to observe [her] cohort[] so that it is fair to conclude that [she]

18

shared in [his] actions and mental state. . . . [Moreover,] the defendant's presence gives [her] an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' (*Clark*, *supra*, 63 Cal.4th at p. 619.)" (*Scoggins*, *supra*, 9 Cal.5th at p. 678.) In both robberies, Young stopped the vehicle within view of the crimes and sat and watched them unfold. As discussed more fully below in connection with the fourth factor, Young's presence was significant in both robberies, because she knew that Thomas was violent prior to the robberies, and Thomas's willingness to use lethal force became even more evident as the crimes unfolded. (See *Henley*, *supra*, 85 Cal.App.5th at p. 1016.) Further, as detailed below in connection with the fifth factor, Young's presence is significant in light of her "fail[ure] to act as a restraining influence," from which it is "fair to conclude that [s]he shared in [Thomas's] actions and mental state." (*Clark*, *supra*, at p. 619.) This factor weighs heavily against her in both murders.

The third factor is absent in this case. The robberies do not appear to have been prolonged.

With respect to the fourth factor, subsequent to *Banks* and *Clark*, our Supreme Court has expressed the question as "What was the defendant's knowledge of his or her confederate's *propensity for violence* or likelihood of using lethal force?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 (italics added).) "Defendant's knowledge of such factors may be evident before the felony or may occur during the felony." (*Clark*, *supra*, 63 Cal.4th at p. 621.) At the time of the Aragon robbery, Young had knowledge of Thomas's propensity for extreme violence. The fact that Thomas had beaten a woman so badly that she was

19

hospitalized demonstrated that he was not constrained when it came to inflicting severe injury on a vulnerable person. The Aragon robbery quickly devolved into actual violence as the two men fought, yet Young did not abandon Thomas or take action to stop the violence. She instead continued in her role as lookout, ensuring that Thomas could leave the scene undetected. By the time Thomas robbed Ben-Meir a little over a week later, Young knew for certain that he was capable of killing. She heard Thomas fire the shotgun when robbing Aragon, heard a louder than blood-curdling scream, and saw Aragon slumped against a wall. The trial court found her testimony that she did not know Aragon had been shot, and possibly killed, not credible. Substantial evidence supports the trial court's findings.

As to the fifth factor, there is no evidence that Young made any attempt to minimize the violence. She did not try to persuade Thomas not to use the shotgun in the robberies or to unload it and just use it to scare the victims. When she saw the situations escalate, she continued to act as lookout and did not intervene. This factor does nothing to mitigate her culpability.

Analyzing the totality of the circumstances, we conclude that Young acted with reckless indifference to human life in both robberies. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) " 'The Supreme Court . . . made clear felony murderers . . . who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life.' [Citation.]" (*Clark*, *supra*, 63 Cal.4th at pp. 617–618.) The high court has elaborated that "[a] robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun is what we meant by 'a garden-variety armed robbery' in *Banks*, *supra*, 61 Cal.4th at page 802." (*Clark*,

*supra*, 63 Cal.4th at p. 617, fn. 74.)  The Court has not otherwise set a standard for a garden-variety armed robbery.  (*Ibid*.)  Young did not simply have knowledge that Thomas planned to use a gun and that use of a gun in any armed robbery presents certain dangers to human life.  She was subjectively aware of the increased risk the robberies posed under the specific conditions presented, but she continued to play a vital role in the crimes.  As she testified at Thomas's trial, she was "in for all the robberies" and "in for whatever came out of it."  Her actions were without question "a gross deviation from the standard of conduct that a law-abiding person" and only enforce our conclusion that she acted with reckless indifference to human life.  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

Substantial evidence supports the trial court's findings that Young was a major participant who acted with reckless indifference to human life in both robberies.  As such, she could still be found guilty of felony murder under sections 188 and 189 as amended on January 1, 2019.

## DISPOSITION

We affirm the trial court's order denying Young's section 1172.6 petition.

NOT TO BE PUBLISHED.


MOOR, J.

I CONCUR:


KIM (D.), J.

The People v. Destiny Young
B331830

BAKER, Acting P. J., Concurring in Part and Dissenting in Part

The majority correctly concludes substantial evidence supports the ruling that defendant and appellant Destiny Young (defendant) is ineligible for Penal Code section 1172.6 relief in connection with her conviction for the voluntary manslaughter of Gabriel Ben-Meir.  There is no substantial evidence, however, supporting the ruling that defendant (who the majority rightly describes as a "lookout and getaway driver") was ineligible for Penal Code section 1172.6 relief on her conviction for the earlier voluntary manslaughter of Marcelo Aragon.  Even assuming there were sufficient evidence of her major participation in the Aragon manslaughter, there is still insufficient evidence that—at that point in time—defendant harbored the requisite reckless indifference to human life,[1] which is an issue on which we can expect further guidance from our Supreme Court.[2]

BAKER, Acting P. J.

---

[1]     Indeed, the majority apparently credits the evidence that Young was hoping the actual killer would not hurt anyone.

[2]     Our Supreme Court may have occasion to discuss the correctness of the majority's assertion that a finding of major participation can "alone" be a "factor that weighs heavily" against a defendant when analyzing the separate issue of reckless indifference to human life.